**NATIONWIDE GENERAL INSURANCE COMPANY, a corporation of the State of Ohio, Defendant Below, Appellant,**

v.

**Amy ROYAL, Plaintiff Below, Appellee.**

**No. 487, 1996.**

Supreme Court of Delaware.

Submitted: June 10, 1997.
Decided: Sept. 18, 1997.

---

John D. Balaguer, White and Williams, Wilmington, for Appellant.

H. Clay Davis, III, Georgetown, for Appellee.

Before VEASEY, C.J., WALSH, HOLLAND, HARTNETT and BERGER, JJ., constituting the Court en banc.

BERGER, Justice.

In this appeal, we consider whether injuries sustained as the result of a drive-by shooting "arise out of the use of a motor vehicle" for purposes of automobile insurance coverage. On cross-motions for summary judgment, the Superior Court determined that Amy Royal was entitled to coverage under the underinsured motorist provisions of a policy issued to her by Nationwide General Insurance Company. We agree with the legal test adopted by the Superior Court, but we disagree with the court's application of that test to the facts of this case. We find that the vehicle from which the shots were fired was not an "active accessory" to the assault that caused Royal's injuries. We therefore conclude that Royal's injuries did not arise out of the use of an automobile and that she was not entitled to coverage under her Nationwide policy.

## I. FACTUAL BACKGROUND

The relevant facts are undisputed. William Downes sought retribution against Harvey Baker, Royal's boyfriend, and decided to "shoot up" Baker's home, a trailer. Downes, whose driver's license had been suspended, convinced William Mariner to drive him to the trailer in the early morning hours of August 25, 1994. Downes had some difficulty locating Baker's trailer. He first entered someone else's trailer and pointed a gun at the occupant. After learning that he was in the wrong trailer, Downes returned to Mariner's car and the two continued their search for Baker's home. When Downes spotted the correct trailer, he got a rifle out of the trunk of Mariner's car, returned to the car and instructed Mariner to drive by the trailer. Mariner drove as fast as he could and Downes fired several shots. Royal was asleep inside the trailer. She was struck by a bullet and seriously injured.

Royal filed a claim against Mariner, which was settled for the $15,000 limit provided by Mariner's automobile insurance policy. Royal also filed a claim against Nationwide, her own automobile insurance company, seeking recovery under the underinsured motorist provision of her policy. The Nationwide policy provides:

> We will pay damages, including derivative claims, which are due by law to you ... from the owner or driver of an uninsured[/underinsured] motor vehicle because of bodily injury suffered by you.... Damages must result from an accident arising out of the:
> 1. ownership;
> 2. maintenance; or
> 3. use;
> of the uninsured[/underinsured] motor vehicle.

Nationwide determined that Royal's injuries did not arise out of the use of Mariner's car and it denied coverage. This declaratory judgment action followed.

## II. STANDARD AND SCOPE OF REVIEW

We review the trial court's grant of summary judgment de novo.[1] The sole question presented is whether the Nationwide policy affords coverage for Royal's injuries. The parties agree that certain elements necessary to trigger underinsured motorist coverage have been satisfied. They acknowledge that the $15,000 provided by Mariner's liability insurance carrier did ·not fully compensate Royal or her injuries. In addition, it is undisputed that the limit of Royal's underinsured motorist benefits is $300,000. Finally, the parties agree that Royal's injuries were caused by an "accident" as that term is used in the Nationwide policy. Thus, the only issue is whether Royal's injuries "ar[ose] out of the ... use ... of the [underinsured] motor vehicle."

## III. DISCUSSION

The question of whether injuries sustained as the result of a drive-by shooting "arise out of the use of a motor vehicle" for purposes of automobile insurance coverage has been widely debated.[2] "The majority of courts ... have viewed the operation of the vehicle and the shooting as essentially separate incidents and ‍have denied insurance coverage." One court, for example, refused coverage on the grounds that a random act of violence by a passenger in a motor vehicle is not a risk reasonably contemplated by the parties to an automobile insurance contract.[3] Other courts have denied coverage on the theory that it was the deliberate, criminal act of firing a gun that caused the injuries, not the use of a motor vehicle.[4] These courts, using similar approaches, found no causal relationship between the use of the automobile and the injuries.

The Minnesota Supreme Court adopted a three-part test to determine the availability of coverage in a car-to-car shooting. In *Continental Western Insurance Co. v. Klug*,[5] the court analyzed: (1) whether the vehicle was an "active accessory" in causing the injury—*i.e.*, "something less than proximate cause in the tort sense and something more than the vehicle being the mere situs of the injury;" (2) whether there was an act of independent significance that broke the causal link between use of the vehicle and the injuries inflicted; and (3) whether the vehicle was used for transportation purposes.[6] The *Klug* approach provides a flexible framework that takes into the account the circumstances of the injury and promotes the legislative purpose of Delaware's underinsured motorist statute—the "protection of innocent persons from the negligence of unknown or i·npecunious tortfeasors."[7] For this reason, we adopt *Klug's* three-part test as the standard by which the courts of this State should determine whether an injury has arisen out of the operation, use or maintenance of a motor vehicle.

Even with the help of a clearly articulated standard, there is sometimes room for debate as to the proper application of that standard to the facts presented. The trial court applied the *Klug* test and found that Royal was entitled to coverage. We apply the same facts, and find otherwise.

The first prong of the *Klug* test—whether the vehicle was an "active accessory" in causing Royal's injuries—is dispositive. Royal was asleep inside her boyfriend's home when she was injured by shots fired from a passing vehicle. The vehicle was not an essential or even a significant element in the events that led to Royal's injuries. Downes did not use the vehicle in order to catch up with or

1.  *Merrill v. Crothall–American, Inc.*, Del.Supr., 606 A.2d 96, 99 (1992).

2.  *See* Charles W. Benton, Annotation, *Automobile Insurance Coverage for Drive–By Shootings and Other Incidents Involving the Intentional Discharge of Firearms from Moving Motor Vehicles*, 41 A.L.R.5th 91 (1996).

3.  *See State Farm Mut. Auto. Ins. Co. v. Spotten*, Ind.Ct.App., 610 N.E.2d 299 (1993).

4.  *See Ruiz v. Farmers Ins. Co.*, 177 Ariz. 101, 865 P.2d 762 (1993); *Taylor v. Phoenix Ins. Co.*, Fla. Dist.Ct.App., 622 So.2d 506 (1993).

5.  Minn.Supr., 415 N.W.2d 876 (1987).

6.  *Id.* at 878.

7.  *See Frank v. Horizon Assur. Co.*, Del.Supr., 553 A.2d 1199, 1201 (1989).

better position himself to shoot at Royal. He could have injured her just as easily without a vehicle by shooting at the trailer from the street or by walking up to, or even into, the trailer. In fact, prior to successfully locating and shooting at Baker's trailer, Downes actually walked into the wrong trailer and threatened the man inside with a revolver. The fact that Downes eventually injured Royal by shooting from Mariner's vehicle was fortuitous.

*Klug* notes that the resolution of this coverage issue is highly fact specific.[8] It is instructive that, in other jurisdictions, coverage is routinely denied in fact patterns like ours. For example, in *Auto Owners Insurance Co. v. Rucker*,[9] a sixteen year-old girl was waiting in front of a friend's house for her ride home when she was killed by shots fired from a passing car. The insurer of the vehicle used in the incident sought and was granted a declaration that it was not liable for the victim's injuries. On appeal, the Michigan Court of Appeals explained that the "sole issue" was whether the victim's death "arose out of the use of the motor vehicle."[10] That inquiry turned on whether there was a causal connection between the use of the vehicle and the injury. "The connection must be more than incidental or fortuitous. It is insufficient to show that, but for the automobile, the incident would not have occurred. The injury must be foreseeably identifiable with the normal use of the vehicle."[11] The court denied coverage concluding that, "[a]lthough the vehicle made it easier for the criminals to approach the scene

and to escape, its use was nonetheless incidental to the injury."[12]

Similarly, the Arizona Court of Appeals held that a man standing at a drive-through window who was shot by a departing motorist was not entitled to coverage under the shooter's automobile insurance policy.[13] The court reasoned that there was not a sufficient connection between the victim's injury and the vehicle. "From the standpoint of causation, this injury could have occurred in the woods, in a hunting lodge, or in a house."[14]

By contrast, the cases where coverage has been found involved victims who were injured in car-to-car chases.[15] The automobile, in those cases, was not merely a means of arriving at the scene of the injury. It was an essential component of the assault.

We find that the Mariner vehicle was not an "active accessory" to Royal's injuries. Accordingly, we hold that Royal's injuries did not arise out of the use of a motor vehicle. We are not unmindful of the settled principle that insurance contracts are liberally construed in favor of finding uninsured/underinsured coverage.[16] Even a liberal reading of the phrase "arising out of the use of a motor vehicle," however, does not warrant a finding of coverage under the facts of this case. As this Court recently cautioned in another automobile insurance coverage case, "[e]ven liberal construction has its limits."[17]

## IV. CONCLUSION

Based on the foregoing, we conclude that Royal was not entitled to underinsured mo-

**8.** 415 N.W.2d at 877–78.

**9.** 188 Mich.App. 125, 469 N.W.2d 1 (1991) (*per curiam*).

**10.** *Id.*, 469 N.W.2d at 1.

**11.** *Id.* at 1–2.

**12.** *Id.* at 2.

**13.** *Vanguard Ins. Co. v. Cantrell*, 18 Ariz.App. 486, 503 P.2d 962 (1972).

**14.** *Id.*, 503 P.2d at 964 (quoting *Brenner v. Aetna Ins. Co.*, 8 Ariz.App. 272, 445 P.2d 474, 478 (1968)).

**15.** *See, e.g., State Farm Mut. Auto. Ins. Co. v. Davis*, 9th Cir., 937 F.2d 1415 (1991); *Klug*, 415 N.W.2d 876; *Wausau Underwriters Ins. Co. v. Howser*, 309 S.C. 269, 422 S.E.2d 106 (1992) (*per curiam*); 41 A.L.R.5th 91, § 3[a]. On the other hand, several courts have denied coverage for shooting injuries resulting from car chases. *See, e.g., Ruiz*, 177 Ariz. 101, 865 P.2d 762; *Coleman v. Sanford*, Miss.Supr., 521 So.2d 876 (1988); *Nationwide Mut. Ins. Co. v. Knight*, 34 N.C.App. 96, 237 S.E.2d 341 (1977); 41 A.L.R.5th 91, § 3[b].

**16.** *See Frank v. Horizon Assur. Co.*, Del.Supr., 553 A.2d 1199, 1201–02 (1989).

**17.** *National Union Fire Ins. Co. v. Fisher*, Del. Supr., 692 A.2d 892, 896 (1997).

torist benefits under her Nationwide policy and the decision of the Superior Court granting summary judgment in favor of Royal is REVERSED.

WALSH, Justice, with whom HOLLAND, J. joins, dissenting:

The majority ruling reverses a decision of the Superior Court that permitted recovery under an underinsured motorist policy for injuries sustained in a drive-by shooting. In so doing, the majority approves the trial court's application of the legal standard for determining whether the injuries in question arose out of the use of a motor vehicle, but concludes that the underlying incident does not meet the legal test because the vehicle was not an "active accessory" to the assault. In my view, the Superior Court correctly applied the appropriate standard and its ruling should be affirmed.

The majority has characterized the incident giving rise to Royal's claim as a drive-by shooting but does not dwell upon the importance the use of a motor vehicle played in this incident. Certain additional facts require recitation, if not emphasis, to aid in an understanding of the role a motor vehicle played in this tragic event.

In his effort to seek revenge against Baker, Downes was limited by his inability to drive. Accordingly, he enlisted, indeed hired, Mariner as his "chauffeur." After ascertaining Baker's location, Downes armed himself with a high-powered rifle and also instructed his chauffeur to proceed at a high speed past the trailer while he fired several shots at the trailer. Royal, an innocent bystander, was severely injured by Downes' use of a dangerous weapon. It is a fair inference that the risk of harm resulting from Downes' conduct was heightened by his ability to fire several shots in a short period of time, with the assurance that he could quickly depart the scene.

In ruling that Royal's injuries arose out of the use of the Mariner vehicle, the Superior Court applied the three pronged test fashioned by the Minnesota Supreme Court in

*Continental W. Ins. Co. v. Klug,* Minn.Supr., 415 N.W.2d 876 (1987). The majority endorses the *Klug* approach as providing "a flexible framework" and one promotive of the goal of uninsured motorist coverage—"the protection of innocent persons from the negligence of unknown or impecunious tortfeasors" (quoting *Frank v. Horizon Assur. Co.,* Del.Supr., 553 A.2d 1199, 1201 (1989)).

The majority, however, parts company with the Superior Court holding that this case satisfies *Klug's* fact prong—that the vehicle was an " 'active accessory' in causing the injury." *Klug,* at 878. Respectfully, I believe the majority's view of *Klug's* active accessory prong is inconsistent with *Klug's* caveat that active accessory is not to be equated with causation.

Over the past several decades our society has witnessed an increase in the use of guns to commit violent crimes. This phenomenon has been paralleled by the proliferation of automobiles in an increasingly mobile society. It is not surprising, therefore, that injuries inflicted through a combination of guns and cars have been the subject of considerable insurance coverage litigation. The legal issue of whether an accident arises out of the use or maintenance of an automobile is a question that defies a simple test, as a survey of "gun and car" cases attests.[18] As is the case in other developing areas of tort law, the facts of the underlying claim often determine the outcome of the litigation rather than the rigid application of legal principles.

In this case, the Mariner vehicle was used in a manner that made it an "active accessory" in causing Royal's injuries as contemplated by the *Klug* test. By definition a "drive-by" shooting requires the use of a motor vehicle to enable the tortfeasor to quickly come upon the scene, rapidly fire shots from a moving platform and then hurriedly leave the vicinity to avoid identification or arrest. When used in this manner the vehicle is no longer simply the situs of the act but, rather, significantly facilitates the infliction of inju-

---

**18.** A comprehensive collection of cases involving automobiles and guns is contained in the ALR 4th. Larry D. Scheafer, Annotation, *Automobile Liability Insurance: What are Accidents or Injuries "Arising Out of Ownership, Maintenance, or Use" of Insured Vehicle,* 15 A.L.R.4th 10 (1982).

ry.[19] The vehicle adds an element of recklessness to the tortious conduct that would otherwise be absent and, as here, heightens the risk of injury to innocent parties. In speeding past the target, the tortfeasor, with no regard for accuracy, utilizes the element of surprise to spray bullets into an area potentially occupied by innocent and unsuspecting people. This increased danger is evidenced by the fact that Royal, an unintended victim, was severely injured as a result of the tortfeasor's decision to use the Mariner vehicle to quickly and randomly shoot into the mobile home.

Although the majority found the absence of the "active accessory" prong fatal to Royal's claim and, thus, ended its analysis there, the remaining prongs of *Klug* are also satisfied here. Under the second prong of the *Klug* test, it is clear that there was no intervening act of independent significance that would have broken the causal link between the vehicle and the injury. The facts presented in this case are distinguishable from those cases in which the vehicle has come to rest and, thus, was not an active accessory to the infliction of the injury. An example of the latter is the scenario of a disagreement between two motorists that results in the actors exiting their cars and committing an assault. *Day v. State Farm Mut. Ins. Co.,* 261 Pa.Super. 216, 396 A.2d 3 (1978). In such cases the vehicles merely transport the actors to the location and add nothing to the danger of the situation. Finally, the third prong of *Klug* is satisfied because the Mariner vehicle was directly being used for essential transportation purposes. The vehicle allowed Downes to maneuver into a position to fire the shots and then quickly escape the area.

Under the *Klug* standard now adopted by this Court, Royal's injuries, in my view, can be said to have arisen out of the ownership, operation or use of the Mariner vehicle. Delaware's uninsured/underinsured statute was designed to financially protect innocent insureds from individuals in our society who utilize their automobiles in a tortious way and without the ability to adequately compensate their victims. The statute's remedial purpose should dispel doubt in borderline cases, such as this. I would affirm the judgment of the Superior Court.

---

19. The need for a causal connection between the injury and the ownership, maintenance or use of the vehicle has been recognized. This requirement, however, does not mean that the vehicle needs to be the instrumentality that causes the injury. *Selected Risks Ins. Co. v. Pennsylvania Mfrs. Ass'n. Ins. Co.,* Del.Super., C.A. No. 83C–JN–57, 1986 WL 13107, Walsh, J. (June 20, 1986). Rather, it is sufficient if there is a causal nexus between the injury and the operation of the vehicle. *Id.*